United States Court of Appeals
Fifth Circuit
**F I L E D**
October 9, 2008
Charles R. Fulbruge III
Clerk

# UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT



No. 07-51392

D.C. Docket No. 3:07-CR-249-3

UNITED STATES OF AMERICA

      Plaintiff - Appellee

  v.

ROBERT CALDWELL

      Defendant - Appellant

Appeal from the United States District Court for the
Western District of Texas, El Paso.

Before DAVIS, CLEMENT, and ELROD, Circuit Judges.

J U D G M E N T

    This cause was considered on the record on appeal and the briefs on file.

    It is ordered and adjudged that the judgment of the District Court is affirmed.

ISSUED AS MANDATE: NOV 1 8 2008

A True Copy
Attest

Clerk, U.S. Court of Appeals, Fifth Circuit

By: _____
Deputy

New Orleans, Louisiana  NOV 1 8 2008

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**
October 9, 2008

Charles R. Fulbruge III
Clerk

No. 07-51392

UNITED STATES OF AMERICA

                Plaintiff-Appellee

v.

ROBERT THOMAS CALDWELL

                Defendant-Appellant

Appeal from the United States District Court
for the Western District of Texas
USDC No. 3:07-CR-249-3

Before DAVIS, CLEMENT, and ELROD, Circuit Judges.

DAVIS, Circuit Judge:[*]

Defendant-Appellant Robert Thomas Caldwell appeals from the district court's denial of his motion for judgment of acquittal, following his conviction on one count of attempting to export and aiding and abetting the attempted export of defense articles in violation of certain export control regulations. In addition, he appeals from his sentence of 20 months' imprisonment. Because we find that the evidence was sufficient to convict and that the sentence imposed was not unreasonable, we affirm.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 07-51392

## I. BACKGROUND

This case centers around the attempted unlicensed export of certain single-use batteries, designed for use in HAWK missile systems, in violation of the Arms Export Control Act (AECA), 22 U.S.C. § 2778(b)(2) and (c), and the associated International Traffic in Arms Regulations (ITAR), 22 C.F.R. §§ 120.1–120.32. It is undisputed that the batteries in question are covered by the United States Munitions List (USML), 22 C.F.R. §§ 121.1–121.16, as "defense articles." The export of USML defense articles must be licensed pursuant to 22 C.F.R. §§ 123.1–123.17, and failure to do so constitutes a violation of 22 U.S.C. § 2778 and 22 C.F.R. §§ 127.1–127.12. Collectively, we refer to the relevant AECA and ITAR provisions as the "export control regulations."

This case arose from a sting operation designed and carried out by the United States Bureau of Immigration and Customs Enforcement (ICE), in which it established a fake company, Mercury Global, in El Paso, Texas. Chris Tappin, a British businessman, contacted Mercury Global in December of 2005 through a representative in the United States, seeking the unlicensed export of a USML-listed camera and USML-listed HAWK missile batteries, all in violation of the export control regulations. He agreed to pay $5,000 apiece—$2,000 above retail price—for 50 batteries. During these negotiations, Tappin and the undercover agents discussed the specifics of the plot, including the use of double (*i.e.*, false) invoices.

The undercover agents stopped the first attempted shipment by arresting one of Tappin's representatives in the United States. The agents informed Tappin that the shipment had encountered problems at customs in New York, necessitating a change of plans for any future shipment. Mercury Global then contacted Southeast Overseas, another shipping company, regarding possible participation, but Southeast declined to join in when it learned of the licensing

2

issues. At that point, Tappin informed Mercury Global that it would be contacted by Caldwell, an Oregon fertilizer importer, who would purchase the batteries on Tappin's behalf and ship the batteries to Tappin in the United Kingdom via Murphy Shipping Company located in Houston, Texas.

Here the stories told by Caldwell and the government diverge. Caldwell asserts that the undercover agents at Mercury Global never clearly discussed the licensing requirements and illegal plot with him, as they had with Tappin's representative, Tappin himself, and Southeast Overseas. Instead, Caldwell claims, the government agents only referred to the licensing requirements in boilerplate language on a pro forma invoice and otherwise never explicitly discussed the illegal nature of what they were doing. Caldwell claims the government agents assumed Tappin would tell him about the illegality of shipping without a license, but Tappin never did. In short, Caldwell asserts that he never really knew about the export control regulations.

The government, however, points to excerpts from various conversations between Caldwell and undercover agents at Mercury Global, faxes sent by Caldwell, and the pro forma invoice mentioned above. On December 20, 2006, an undercover agent asked Caldwell, "[Y]ou do know about the licensing issues involved with this, correct? Did he explain that to you?" Caldwell replied, "You know, that's something I am not quite . . . familiarized with . . . ." The agent then said that "the biggest issue is the . . . licensing issues" and discussed structuring the transaction as a domestic sale with subsequent export, provided "you have a company and . . . you've done this in the past where . . . you can . . . [m]ove things out . . . without it being scrutinized." Caldwell responded, "Well, . . . I'm not . . . totally hip on all the . . . issues at hand, but . . . we've done things in the past and it's just . . . easier to have . . . agents and . . . domestic purchases and domestic exports . . . for some of our projects."

3

Caldwell then faxed Tappin some questions regarding "other parameters," stating, "Such issues could not freely discuss [sic] on the phone." The government presented evidence that, during Caldwell's subsequent phone conversation with Tappin, he wrote down the words "batteries," "trucks," and "military." During a December 28, 2006, conversation, an undercover agent referenced "the sensitivity of the items," while Caldwell stated that "I want to protect you and your enterprise . . . from anything." In the same conversation, Caldwell later stated, "Yeah, I mean all the paperwork. . . . I understand totally. I understand." The two made plans to meet in January of 2007 in San Antonio.

On January 3, 2007, the undercover agent contacted Caldwell regarding a pro forma invoice that the agent was faxing over. Caldwell was instructed to maintain double invoices, keeping the "actual one" (*i.e.*, the one with the USML-listed HAWK missile batteries and true purchase price) for his records but a false invoice with a "devalued description" "[s]o that it won't raise any red flags" in a possible inspection. On January 4, Caldwell received a pro forma invoice listing five "GAP-4328" "inert zinc/silver oxide reserve batteries" and containing the following notice:

> Export of the commodities described herein is strictly prohibited without a valid export license issued by the U.S. State Department, Office of Defense Trade Controls, prescribed in the International Traffic in Arms Regulations (ITAR), Title 22, Code of Federal Regulations, Parts 120-130.

This is the same notice Caldwell attacks on appeal. The government showed that Caldwell faxed the pro forma invoice to Tappin with an asterisk next to it and a note directing him to "please see detail below."

On January 8, Caldwell sent a purchase order to Mercury Global for five batteries, listing Caldwell as the purchaser and directing Mercury Global to ship the product to Murphy Shipping in Houston, Texas. This false invoice did not

4

name the USML-listed batteries but instead listed the batteries as "Tideland Gap inert non-spillable reserve batteries."

Caldwell met with the undercover agent in San Antonio on January 25, 2007, and they discussed the plan. Caldwell stated, "I still have a bit of trepidation about some of the possible liabilities...." The agent asked, "With these items... my biggest concern is... now you're not going to file for an export license on these, correct?" Caldwell replied, "I hadn't planned on it." Caldwell later mused, "I just don't feel like I'm completely comfortable with all of the different features of this thing but... I mean it sounds like it's... can be done pretty easily and...[w]ithout..., you know, raising too many flags. And you know, I don't... the thought of, you know, something that is potentially illegal isn't cool. But I don't see it being, I mean...."

The government showed that, later at the same meeting, Caldwell explained his plans to circumvent the export control regulations by disguising the USML-listed batteries as non-USML-listed batteries manufactured by Tideland Signal Corporation, and shipping them overseas to Tappin through Murphy Shipping. Caldwell then gave the agent a $5,000 check and directed the agent to send the batteries to Murphy Shipping in Houston, at which point Murphy would forward the batteries to the United Kingdom. Before the meeting ended, Caldwell was arrested. In his possession were various documents relating to the transaction, including the pro forma invoice, faxes, and false purchase orders for Tideland batteries.

On February 7, 2007, Caldwell was charged with one count of conspiracy to violate the export control regulations, and one count of attempting to export and aiding and abetting the same. At trial, a Murphy Shipping representative testified that both Tappin and Caldwell made shipping arrangements for "Tideland batteries," never mentioning Mercury Global and never supplying the pro forma invoice with the true description of the batteries. Further testimony

established that the batteries at issue were USML-listed, and Tideland did not manufacture or sell that type of battery. Caldwell testified and admitted that Tappin told him of the batteries' military application; he also admitted to seeing the "export warning" on the pro forma invoice. At the close of evidence, the district court denied Caldwell's motion for judgment of acquittal. The jury acquitted Caldwell on the conspiracy count and convicted him on the count of attempting export and aiding and abetting the same.

Prior to sentencing, the Probation Department's presentence report (PSR) calculated Caldwell's criminal history category at I, with a base offense level of 24, based on an original offense level of 26 with a two-level reduction for his minor role in the offense. The Probation Department declined to amend the PSR in response to Caldwell's objection to the description of the offense conduct and argument that he should receive a four-level reduction for his minimal role. At sentencing, the district court sustained Caldwell's objection concerning the mitigating role adjustment, lowering the relevant offense level to 22 and calculating the resulting advisory Guidelines range at 37 to 46 months, which Caldwell admitted was properly calculated.

Caldwell also requested an aberrant behavior departure pursuant to U.S. SENTENCING GUIDELINES MANUAL § 5K2.20 and sought a significant departure from the Guidelines range in that he sought probation only. The court declined to sentence Caldwell to probation only, stating that "even if I were to consider a sentence outside the guideline range, . . . going to probation would probably be—that's too much of a departure. There's no doubt that it would come back if the Government appealed it." However, the court did find that Caldwell was entitled to the aberrant behavior departure under § 5K2.20, sentencing him to 20 months' imprisonment, followed by two years of supervised release and 150 hours of community service, as well as imposing a $100 special assessment.

No. 07-51392

Caldwell's appeal focuses on three claims of error concerning the district court's denial of his motion for judgment of acquittal, all centering on the sufficiency of the evidence, and one claim of error regarding the reasonableness of his sentence.

## II. SUFFICIENCY OF THE EVIDENCE CLAIMS

Caldwell's first three claims of error assert that the district court erred by not granting his motion for judgment of acquittal because there was insufficient evidence to show: that he acted with specific intent to violate a known duty, that he willfully attempted export without a license, or that he aided and abetted the unlicensed export. These claims center on only two arguments: (1) that the government presented insufficient evidence that Caldwell possessed the specific intent to violate a known legal duty, and (2) that the government presented insufficient evidence that Caldwell actually attempted to export the batteries in question, because he was arrested before the batteries reached the point of export.

> When an insufficiency-of-the-evidence claim of error is properly preserved through a motion for judgment of acquittal at trial, it is reviewed *de novo*. [*United States v. Ragsdale*, 426 F.3d 765, 770 (5th Cir. 2005)]. Under that standard, "'[w]e will affirm . . . if a reasonable trier of fact could conclude . . . the elements of the offense were established beyond a reasonable doubt, viewing the evidence in the light most favorable to the verdict and drawing all reasonable inferences from the evidence to support the verdict'". *Id.* at 770-71 (quoting *United States v. Floyd*, 343 F.3d 363, 370 (5th Cir. 2003)).
>
> \* \* \*
>
> To preserve *de novo* review, . . . a defendant must specify at trial the particular basis on which acquittal is sought so that the Government and district court are provided notice.

*United States v. McDowell*, 498 F.3d 308, 312 (5th Cir. 2007). Here, Caldwell did raise the three specific bases for his insufficient evidence claims at the district

7

court. Thus, Caldwell is entitled to *de novo* review of his motion for judgment of acquittal.

### A. Applicable Law

The count of the indictment on which Caldwell was convicted alleged that he "attempted to export and aided and abetted the attempted export from the United States of defense articles . . . in violation of Title 22, United States Code, Section 2778(b)(2) and 2778(c), and Title 22, United States Code of Federal Regulations, Sections 121.1, 121.4, 123.1[,] 127.1(a), 127.1(c) and 127.3; Title 18, United States Code, Section 2."

Section 2278(b)(2) provides, in relevant part, that "no defense articles or defense services designated by the President under subsection (a)(1) of this section may be exported or imported without a license for such export or import, issued in accordance with this chapter and regulations issued under this chapter. . . ." 22 U.S.C. § 2778(b)(2). Defense articles are itemized in the USML. 22 C.F.R. § 121.1–121.16. The criminal penalties for violating § 2778(b)(2) are found in § 2778(c), which provides: "Any person who willfully violates any provision of this section or section 2779 of this title, or any rule or regulation issued under either section, . . . shall upon conviction be fined for each violation not more than $1,000,000 or imprisoned not more than ten years, or both." 22 U.S.C. § 2778(c).

The general requirements for conviction under these sections are well established and are not disputed by the parties here.

> To sustain a conviction under 22 U.S.C. § 2778, the government must prove beyond a reasonable doubt that the defendant willfully exported or attempted to export defense articles that are on the United States Munitions List without a license. Hence, the statute requires the government to prove that the defendant acted with specific intent to violate a known legal duty.

*United States v. Covarrubias*, 94 F.3d 172, 175 (5th Cir. 1996) (citations omitted). "The government may use both direct and circumstantial proof, and the jury may infer willful violation of a known legal obligation from facts and circumstances surrounding the case." *United States v. Dien Duc Huynh*, 246 F.3d 734, 743 (5th Cir. 2001) (internal quotations and citations omitted).

Caldwell's indictment raises issues relating to both aiding and abetting as well as attempt. Aiding and abetting liability comes from 18 U.S.C. § 2, which provides, in relevant part: "(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."

> A conviction for aiding and abetting under 18 U.S.C. § 2(a) requires the government to establish that the defendant wilfully associated himself in some way with the criminal venture and wilfully participated in it as he would in something he wished to bring about. *United States v. Fischel*, 686 F.2d 1082, 1087 (5th Cir. 1982). "Association means that the defendant shared in the criminal intent of the principal. Participation means that the defendant engaged in some affirmative conduct designed to aid the venture." *United States v. Colwell*, 764 F.2d 1070, 1072 (5th Cir. 1985). *See United States v. Westbo*, 746 F.2d 1022, 1025 (5th Cir. 1984).

*United States v. Ortiz-Loya*, 777 F.2d 973, 980 (5th Cir. 1985).

Finally,

> [t]he crime of attempt requires the Government to prove that the defendant (1) intended to commit the underlying offense, and (2) took a 'substantial step,' beyond mere preparation, toward committing that crime. Liability for attempt attaches if the defendant's actions have proceeded to the point where, if not interrupted, [they] would culminate in the commission of the underlying crime.

*United States v. Polk*, 118 F.3d 286, 291 (5th Cir. 1997).

9

## B. Specific Intent

Here, Caldwell asserts that the evidence was insufficient with respect to his specific intent to violate a known legal duty—and thus to join in the criminal intent of the principal, Tappin—because the government failed to supply proof that Caldwell was instructed or informed by anyone that exporting the batteries without a license would violate the law. Caldwell argues that the government's entire case centers on insufficient boilerplate language in an export warning on a pro forma invoice provided to him by an undercover agent. Significantly, Caldwell testified at trial to seeing that export warning, and although he now mentions the asterisk he placed on the fax, he does not state that he faxed the pro forma invoice to Tappin with a note directing Tappin to "please see detail below."

In attacking the sufficiency of the export warning, Caldwell principally relies on *United States v. Adames*, 683 F. Supp. 255 (S.D. Fla. 1988), *aff'd*, 878 F.2d 1374 (11th Cir. 1989), in which the district court granted the defendant's Rule 29 motion for judgment of acquittal following her jury conviction on three counts of violating 22 U.S.C. § 2778—one conspiracy count and two aiding and abetting counts. FED. R. CRIM. P. 29. Because the defendant had neither been told of the licensing requirements nor "was an expert or knowledgeable about licensing and arms shipping requirements," *Adames*, 683 F. Supp. at 257, the government's proof of specific intent to violate a known legal duty hinged on written notice—specifically, an export notice stamped on a sales receipt for firearms, which read in full:

### EXPORT NOTICE

> Certain Products may not be exported from the U.S.A. without specific approval from the Dept. of Commerce (Part 370. Export Administration Regulations) and/or Dept. of State (Title 22, Parts 121-128. (ITAR)). It is the BUYER'S responsibility, not the SELLER'S, to obtain such licensing unless agreed otherwise.

No. 07-51392

*Id.* at 256–57.

The government contended that this warning at least put the defendant on inquiry notice of the licensing requirement. *Id.* at 257. The district court disagreed, relying on the only other case it could find involving written notice, *United States v. Swarovski*, 592 F.2d 131 (2d Cir. 1979). The *Swarovski* notice read in full:

> ABOVE ITEMS ARE OF U.S.A. ORIGIN AND MANUFACTURE. ABOVE PHOTOGRAPHIC EQUIPMENT IS UNDER UNITED STATES DEPARTMENT OF STATE MUNITIONS LIST CATEGORY NUMBER XIII(a), AND AS SUCH MUST BE EXPORT LICENSED BY THE U.S. DEPARTMENT OF STATE PRIOR TO EXPORT FROM THE UNITED STATES.

*Id.* at 133.

The district court found "major differences" between the *Adames* warning and the *Swarovski* warning: the *Adames* warning "fails to specify the equipment, regulation and requirements needed to export the article. In short, it does not provide the purchaser with knowledge that it was unlawful to export the handguns outside the United States without State Department approval." *Adames*, 683 F. Supp. at 258. The district court in *Adames* concluded that the export warning "does not convey sufficient knowledge to meet the specific intent requirement," and the government otherwise had not presented sufficient proof of specific intent; accordingly, the court granted the defendant's motion for judgment of acquittal. *Id.* The Eleventh Circuit affirmed, without citing or otherwise discussing *Swarovski*, finding:

> The evidence demonstrates, at most, that Adames was negligent in not investigating the legal prerequisites to the exportation of firearms. . . . Though it reasonably could be inferred from Adames' suspicious conduct that she was aware of the generally unlawful nature of her actions, that state of mind is insufficient to sustain a finding of guilt under a statute requiring specific intent.

*Adames*, 878 F.2d at 1377.

11

No. 07-51392

Here, Caldwell argues that the export warning on the pro forma invoice is closer to the *Adames* warning than to the *Swarovski* warning. We disagree. The export warning in this case was located on a pro forma invoice itemizing *only* USML-listed batteries. Although the pro forma warning itself does not explicitly refer to the batteries (as the *Swarovski* warning did with the reference to "photographic equipment"), the warning here plainly applies to "the commodities described herein," and the invoice listed only the batteries in question. This warning is unlike the *Adames* warning, which referred only to "certain products" and did not tie the warning to the specific products on the sale receipt in any way. Although the pro forma warning does not list the specific USML category covering the items in question (as did the *Swarovski* warning), the warning here does specifically refer to the need for a "valid export license issued by the U.S. State Department, Office of Defense Trade Controls." This is more specific than the *Adames* warning's "specific approval from the Dept. of Commerce ... and/or Dept. of State" language. *Adames*, 683 F. Supp. at 256–57.

Ultimately, the export warning in this case is closer to the *Swarovski* warning in that it is specific with respect to the items covered and the State Department export licensing requirement. Although the warning in this case does not specify the precise USML provision that covers the defense articles at issue, the warning clearly covers the contents of the invoice and sets out the regulatory basis for the requirements.

Of course, *Adames* focuses solely on the written notice because there was no other evidence to prove specific intent in that case. Here, the written warning is certainly a major part of the government's proof, but the government presented ample other evidence in support of specific intent, such as transcripts of conversations between Caldwell and undercover agents, and faxes exchanged between Caldwell and Tappin. It is the totality of the evidence that controls.

12

Caldwell points to alleged holes in the government's evidence: that the undercover agents did not explicitly tell Caldwell about the batteries and did not know what Tappin had told him; that the undercover agents were not as explicit in their dealings with Caldwell as they had been with Tappin, Tappin's former U.S. representative, and Overseas Shipping; and that an undercover agent testified that Caldwell was not going to be told that the items would actually be exported without an export license. What Caldwell does not address is the substantial record evidence of his knowledge of the licensing requirement and the ultimate destination of the batteries.

Under the applicable standard of review, we must affirm the district court's denial of the motion for judgment of acquittal if "'a reasonable trier of fact *could* conclude . . . the elements of the offense were established beyond a reasonable doubt,'" *McDowell*, 498 F.3d at 312 (quoting *United States v. Ragsdale*, 426 F.3d 765, 770–71) (emphasis added). Caldwell's conviction did not depend on the export warning alone, although that warning alone is arguably sufficient, and Caldwell testified to seeing it.

The government presented ample evidence at trial that Caldwell both knew of the export control regulations' licensing requirements and chose to circumvent them. Caldwell's own communications to undercover agents revealed that he intended to use double invoices, misleading packaging, and omissions in his communications with Murphy Shipping to export the batteries to the United Kingdom without first obtaining the required export license. The test is not whether the jury could have chosen Caldwell's account of the circumstances, but whether their choice to convict was supported by sufficient evidence, "viewing the evidence in the light most favorable to the verdict and drawing all reasonable inferences from the evidence to support the verdict." *Id.* Under that standard, we find that there is sufficient evidence for a reasonable

jury to find that Caldwell possessed the specific intent to violate a known legal duty—the licensing requirements of the export control regulations.

### C. Attempt

Caldwell also argues that there was insufficient evidence to show he attempted to actually export the batteries. This argument is based on the fact that the shipment was arranged in two parts, the first to Murphy Shipping in Houston, the second from Murphy Shipping to the United Kingdom. Caldwell claims that because he was arrested before the batteries had begun the second part of the trip, he was arrested before the export licenses were required and before he gave Murphy Shipping any deceptive instructions regarding shipment out of the United States.

Again, Caldwell fails to adequately address the substance of the evidence on which the jury could rely. Caldwell concedes that he took steps to ship the batteries and stated his intent not to obtain export licenses, although he claims his statement was made only in reference to the shipment to Houston. The government, however, presented a great deal of evidence of Caldwell's plans to disguise the batteries by means of false documentation and packaging, as well as evidence that once the batteries were en route to Murphy Shipping in Houston, Texas, he would need to do nothing else for the batteries to be exported from the United States to the United Kingdom.

Actual export is not required for a violation of 22 U.S.C. § 2778. *See United States v. Castro-Trevino*, 464 F.3d 536, 542 (5th Cir. 2006) ("Indeed, we have on at least two occasions affirmed convictions of violating section 2778 by *attempted* exportation of defense articles on the United States Munitions List without a license."(emphasis in original)) (citing *Covarrubias*, 94 F.3d 172; *Ortiz-Loya*, 777 F.2d at 978, 980). In *Covarrubias*, the defendant was arrested on the United States side of the border with Mexico and was convicted under §

2778 for attempting to violate the export control regulations. 94 F.3d at 172–73. The Fifth Circuit affirmed the defendant's conviction based on the "ample evidence" supporting the jury's verdict, *e.g.*, concealing weapons in the gas tank of his truck and admitting that he had no intention of declaring the concealed weapons to authorities in either country because he knew the transport was illegal. *Id.* at 175. *Ortiz-Loya* involved similar facts—concealed weapons and an arrest on the United States side of the Mexican border—and the same result. 777 F.2d at 980.

These cases under 22 U.S.C. § 2778 conform with the general standards for attempt, which require only an intent to commit the underlying offense and a "substantial step" beyond preparation. *Polk*, 118 F.3d at 291 (citing *United States v. Mandujano*, 499 F.2d 370, 376 (5th Cir. 1974)). "Liability for attempt attaches if the defendant's actions have proceeded to the point where, if not interrupted, would culminate in the commission of the underlying crime." *Id.*; *see also Ortiz-Loya*, 777 F.2d at 980 ("It is not necessary to reach a point of irrevocable commitment in order to be convicted of attempted exportation in violation of 22 U.S.C. § 2778.") (citing *Samora v. United States*, 406 F.2d 1095, 1096 (5th Cir. 1969)).

We have already found that the evidence supports the jury's implicit finding of specific intent, leaving only the "substantial step." The government presented evidence and testimony at trial that the plan for Murphy Shipping to forward the batteries to the United Kingdom was already set, that the division between the domestic leg of the shipment and the export leg was not the clear point of division Caldwell asserts, and that Caldwell had reiterated his plans to circumvent the licensing requirements immediately before paying for the batteries and directing the undercover agent to send them to Murphy Shipping. Based on the evidence presented, the jury could conclude, beyond a reasonable doubt, that Caldwell attempted to violate the export control regulations.

No. 07-51392

## III. SENTENCING CLAIM

For his final claim of error, Caldwell asserts that the district court erred by applying an incorrect presumption when sentencing him. In *Gall*, the Supreme Court explained the standard of review for sentencing as follows:

> Regardless of whether the sentence imposed is inside or outside the Guidelines range, the appellate court must review the sentence under an abuse-of-discretion standard. It must first ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the [18 U.S.C.] § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range. Assuming that the district court's sentencing decision is procedurally sound, the appellate court should then consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard. When conducting this review, the court will, of course, take into account the totality of the circumstances, including the extent of any variance from the Guidelines range. If the sentence is within the Guidelines range, the appellate court may, but is not required to, apply a presumption of reasonableness. But if the sentence is outside the Guidelines range, the court may not apply a presumption of unreasonableness. It may consider the extent of the deviation, but must give due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance.

*Gall v. United States*, 128 S. Ct. 586, 597 (2007) (citation omitted). Because Caldwell concedes that the district court's sentence is procedurally sound, we review only the substantive reasonableness of the sentence under the abuse of discretion standard.

Caldwell's appeal focuses on the fact that, prior to *Gall*, "certain of [the Fifth Circuit's] opinions have arguably supported the view, rejected in *Gall*, that we may, at least in certain instances, require district courts to find extraordinary circumstances before they impose sentences outside of the guidelines range." *United States v. Rodriguez-Rodriguez*, 530 F.3d 381, 388 (5th

16

Cir. 2008) (citing *United States v. Williams*, 517 F.3d 801, 811 (5th Cir. 2008)). Caldwell argues that the district court relied on this earlier standard, which resulted in a longer sentence.

In this case, the properly calculated Guidelines range was 37 to 46 months of incarceration, after the district court sustained one of Caldwell's objections to the PSR and lowered the base offense level by two levels, to 22. The district court also granted Caldwell's request for an aberrant behavior departure pursuant to U.S. SENTENCING GUIDELINES MANUAL § 5K2.20, but declined to impose a probation-only sentence, stating that probation would be "too much of a departure" and likely overturned on appeal. However, the district court then imposed a sentence well below the Guidelines range, sentencing Caldwell to 20 months of incarceration.

Caldwell did not object to the final imposition of sentence at the district court. The posture of this case is thus similar to this court's recent decision in *Rodriguez-Rodriguez*, in which the defendant argued a similar point on appeal based on this Circuit's post-*Booker*, pre-*Gall* case law. In *Rodriguez-Rodriguez*, we explained:

> Even if we assume *arguendo* that *Gall* has now rendered certain prior aspects of our post-*Booker* jurisprudence not only erroneous but also plainly so, there is absolutely nothing to indicate that any such state of affairs influenced the sentence imposed in this case, and certainly affirmance of the instant sentence would not seriously adversely affect the fairness, integrity or public reputation of judicial proceedings. Neither the district court, nor the PSR, nor counsel for the government, nor defense counsel, ever stated or took the position below that any sentence less than 57 months [at the bottom of the Guidelines range] would be presumed to be legally erroneous or that such a sentence could only be imposed if the case presented extraordinary circumstances, not considered, or inadequately considered, by the guidelines. . . .

\* \* \*

> Appellant is not entitled to resentencing under the argument, not raised below, that his sentencing was under a regime of this court's post-*Booker* jurisprudence that amounted to "essentially a restatement of the sentencing regime struck down in *Booker*."
>
> The district court committed no procedural error under *Gall*. We accordingly review the sentence under an abuse-of-discretion standard for substantive reasonableness.

530 F.3d at 388–89 (footnotes omitted).

Here, the district court made a reference to being reversed if it imposed a sentence of probation only and prefaced that remark with the clause "even if I were to consider a sentence outside the guideline range." Superficially, this suggests the district court felt constrained in sentencing Caldwell. However, the district court actually made a significant downward departure from the Guidelines range, unlike the court in *Rodriguez-Rodriguez*. This tempers any strict interpretation of the district court's lead-in clause, since the court not only "consider[ed] a sentence outside the guideline range" but actually *imposed* such a sentence. Clearly, the district court was not, in fact, constrained by the advisory Guidelines range.

Also, no one at sentencing referred to "extraordinary circumstances" or made other statements suggesting that this Circuit's pre-*Gall* standards were the guiding principles under consideration. Importantly, even after *Gall*, sentences outside of the Guidelines range are reviewed for reasonableness, and "appellate courts may therefore take the degree of variance into account and consider the extent of a deviation from the Guidelines" in making that determination. *Gall*, 128 S. Ct. at 595. Thus, the district court's statement does not reveal any conflict with *Gall*.

It is also important to note that Caldwell filed a memorandum at the district court seeking only a reasonable sentence below the advisory Guidelines range, because "[a] prison sentence below the guideline range is a significant

No. 07-51392

sentence for this type of crime, and is sufficient to provide just punishment while promoting respect for the law." At no point in his memo did Caldwell explicitly seek a sentence of probation, only a lesser period of incarceration than the Guidelines range. (He did, however, argue for a sentence of probation at sentencing in open court.) Thus, he is now arguing that a sentence he sought and did not object to at the district court—a lesser sentence than the advisory Guidelines range—is unreasonable.

Caldwell concedes that the imposition of his sentence is procedurally sound, and the record bears that out. We further find that the below-Guidelines sentence imposed in this case is not unreasonable, particularly in light of Caldwell's failure to raise his particular objection at the district court.

## **CONCLUSION**

For the reasons stated above, the district court's judgment is AFFIRMED.